The STATE of Ohio, Appellee,

v.

WILLIAMS, Appellant.

[Cite as *State v. Williams,* 172 Ohio App.3d 646, 2007-Ohio-3266.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 88175.

Decided June 28, 2007.

William D. Mason, Cuyahoga County Prosecuting Attorney, and Micah Ault, Assistant Prosecuting Attorney, for appellee.

Timothy F. Sweeney, for appellants.

---

CHRISTINE T. MCMONAGLE, Judge.

{¶ 1} Defendant-appellant, Ivan Williams, appeals his conviction for aggravated robbery with firearm specifications. Upon review of the facts and pertinent law, we reverse and remand.

{¶ 2} The victim in this case, Rico Dancy, is deaf, and on the night in question, he was visiting a young woman, who is also deaf, at her home in Cleveland, Ohio.

At the end of the evening, the young woman's mother offered to drive Dancy to a bus stop at East 187th and St. Clair, to await transportation home. They arrived at the bus stop sometime just after midnight. Dancy testified that the mother handed him three $100 bills as a birthday present and he put the bills in his left pocket. Dancy had with him a Sidekick II, an electronic device into which he could type and thereby communicate with others. Dancy testified that his back was to the street and he was typing a communication to the young woman previously mentioned, when he felt a gun at the side of his head. Although he was looking out of the corner of his eye, he was able to describe the gun as a black .45–caliber revolver. He testified that the robber reached into his pocket, removed the three $100 bills, walked across the street to a parking lot, got into his car, and drove past him as he left.

{¶ 3} Dancy used his Sidekick II to summon the Cleveland police, who promptly arrived at the scene. Dancy testified that he told the police that the robber was dressed all in blue, was approximately five feet eight or nine inches tall (his height), had on a blue do-rag, and was driving a blue four-door Lexus with temporary tags. He testified, "They took my report, and an officer said, if we catch this guy tonight, can we please come and get you. I said, yeah, you can come to my house. I gave them my home address." The police did, in fact, come to Dancy's house some two and a half hours later. They took him to a location where he remained in the police car and, through the window, viewed a black man at a distance of some 20 feet, a man with a police spotlight focused on him, or under a street lamp, depending upon whose testimony is to be believed. Dancy immediately identified appellant as the robber and was "100% certain" of this identification. Dancy was never shown the car. No further identification procedures were initiated or pursued.

The Motion to Suppress

{¶ 4} "In a motion to suppress, the trial court assumes the role of trier of fact and is in the best position to resolve questions of fact and evaluate witness credibility. A reviewing court is bound to accept those findings of fact if supported by competent, credible evidence. However, without deference to the trial court's conclusion, it must be determined independently whether, as a matter of law, the facts meet the appropriate legal standard." *State v. Curry* (1994), 95 Ohio App.3d 93, 96, 641 N.E.2d 1172.

{¶ 5} Nine months after appellant's arrest, and pursuant to a motion to suppress filed by the defense, a pretrial suppression hearing was held before the court. The only witness presented by the state was Cleveland Police Officer Robert Taylor. He did not interview the victim and was involved in the case only by receiving a radio broadcast concerning a male robbed at gunpoint at East 187th and St. Clair. He testified that the broadcast was for a *black* Lexus, in

*good condition, with a temporary tag.* The suspect in that broadcast was described as a *tall* black male wearing blue clothing, proceeding west from the location of the robbery.

{¶ 6} Officer Taylor testified that several hours later, he came upon a black Lexus with temporary tags. He testified that the driver of the car, appellant, was dressed in a blue jogging suit. He further testified that the victim was brought to the scene in a zone car. The suspect was brought into the middle of the street "under a street lamp" approximately 20 feet away from the victim, and the victim positively identified appellant as having robbed him. Appellant was then arrested. Significantly, Officer Taylor testified that although no weapon was recovered, three $100 bills were found in the possession of appellant. No other witnesses testified.[1]

{¶ 7} In *Neil v. Biggers* (1972), 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401, the United States Supreme Court held that an identification derived from unnecessarily suggestive procedures, *which has a likelihood of leading to a misidentification,* violates a defendant's right to due process. Accordingly, a simply "suggestive identification procedure" will not result in a suppression of the identification unless the procedure has an impact on the reliability of the identification itself.

{¶ 8} In *Stovall v. Denno* (1967), 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199, the Supreme Court discussed the "widely condemned" one-on-one show-up, albeit concluding that under the totality of the circumstances in that case, the identification was nonetheless reliable. More recently, the Sixth Circuit, in *Gregory v. Louisville* (C.A.6, 2006), 444 F.3d 725, 755–756, addressed the condemnation of show-ups in light of the well-recognized dangers inherent in eyewitness identification in general. Quoting *Marshall v. Rose* (C.A.6, 1974), 499 F.2d 1163, 1165, the *Gregory* court stated, "The danger inherent in eyewitness identification has long been a subject of grave concern. By presenting only a single suspect to a witness, police convey an implicit message that 'this is the guy.'" In this case, the victim was asked, "If we get the guy, can we bring him to you?" The implication, of course, was that the person the police would bring to him was "the guy."

---

1. It is important to note that when this same officer testified at trial before the jury some months later, he affirmatively stated that three $100 bills were *not* found on appellant at the time of his arrest. Whether the officer lied at the suppression motion hearing or was merely mistaken and corrected his mistake at trial is not revealed by the record. But a compelling case could be made that the judge, hearing at the suppression motion hearing that this relatively unique collection of bills was found on appellant at the time of his arrest, could well have considered this the indicia of reliability necessary to convert an otherwise tainted procedure into one not conducive to a misidentification.

{¶ 9} Courts employ a two-step process to determine the admissibility of identification testimony. The first step focuses only upon whether the identification procedure was impermissibly suggestive. *Biggers* places show-ups (or cold stands) in this category. See, e.g., *State v. Gross*, 97 Ohio St.3d 121, 2002-Ohio-5524, 776 N.E.2d 1061; *State v. Broom* (1988), 40 Ohio St.3d 277, 533 N.E.2d 682. The second part of the inquiry then focuses upon five factors necessary to assess the reliability of the identification, despite the taint of the show-up. These five factors are (1) the witness's opportunity to view the defendant at the time of the crime, (2) the witness's degree of attention at the time of the crime, (3) the accuracy of the witness's description of the defendant prior to the identification, (4) the witness's level of certainty when identifying the defendant at the confrontation, and (5) the length of time that has elapsed between the crime and the confrontation.

{¶ 10} By producing only the arresting officer, and not the victim, at the suppression hearing, the state presented evidence only as to the fact that the policeman heard the victim state that he was "100% certain" of his identification (the fourth factor listed above). In short, if we analyze this suppression issue solely upon the evidence adduced at the suppression hearing, this identification should have been suppressed.[2]

{¶ 11} The defense conceded in oral argument, however, that because appellant proceeded to trial, in lieu of pleading no contest, due process demands that this court review *all* the evidence produced, whether at the suppression hearing or trial, in determining whether the identification was reliable. See *United States v. Canieso* (C.A.2, 1972), 470 F.2d 1224. The victim did, in fact, testify at trial, and in analyzing the suppression issue, this court will consider the trial testimony, in addition to the testimony produced at the suppression hearing.

{¶ 12} In this case, the robbery took place outdoors around midnight. The victim was hearing impaired, and when initially approached from behind by the robber, he was communicating with a friend by way of a hand-held device called a Sidekick II. The first time he was conscious of the presence of the robber was when a gun was placed to the side of his head. He testified that he saw the robber "out of the side of his eye," that the robber reached into his left pocket, extracted the three bills, and walked past him; the robber's back was to him from then on. The scenario described by the victim took place in an exceedingly short period of time.

---

2. The court held at the conclusion of the suppression motion hearing that the factual inconsistencies in the identification were credibility questions for the jury, when, in fact, the law requires the court itself to analyze the inconsistencies to determine whether the questionable show-up likely led to misidentification.

{¶ 13} At trial, the victim gave inconsistent testimony as to whether the robber's pants were jogging pants or blue jeans. He described a blue do-rag. He did not describe any facial features, although, after some prompting, he said the robber had some facial hair. Significantly, there is no evidence in the record as to whether the defendant had facial hair at the time of the arrest or at the time of trial. There was no consistent testimony as to the height of the robber. The police broadcast described a "tall black man." Dancy, who testified at trial that he is five feet eight inches tall, said the robber was either five feet eight or nine inches tall. There is no testimony whatsoever in the record, either at the suppression hearing or trial, as to appellant's height. The victim stated at trial that the robber weighed 200 pounds. There is nothing in the record as to appellant's weight or build. There is no testimony whatsoever as to any physical feature of the robber, save that discussed above.

{¶ 14} The victim's testified that in his initial report to the police, he stated that he was robbed by a man with a *black* .45–caliber gun who drove a *blue* Lexus with temporary tags:

{¶ 15} "A. It was a four-door Lexis [sic] Blue. It was [sic] a thirty-day tags in the window.

{¶ 16} " * * *

{¶ 17} "Q. Are you positive of the color?

{¶ 18} "A. Um-huh.

{¶ 19} "Q. You're saying it was blue?

{¶ 20} "A. Um-huh.

{¶ 21} " * * *

{¶ 22} "Q. It was a Lexis [sic], correct?

{¶ 23} "A. Yeah.

{¶ 24} "Q. It was blue, is that correct?

{¶ 25} "A. Uh-huh.

{¶ 26} "Q. Was it purple or was it blue?

{¶ 27} "A. I'm not blind. It was blue.

{¶ 28} "Q. You're sure it was blue?

{¶ 29} "A. I'm not blind. I might be deaf, but I'm not blind."

{¶ 30} However, the report that went out over the radio was that the car was a *black* Lexus. The car the police stopped was a black Lexus.

{¶ 31} The victim likewise testified that the robber's blue Lexus had temporary tags. When questioned closely about the temporary tags at trial, he was certain

that the tags were affixed in the rear window of the automobile. The black Lexus that was stopped some two hours later had temporary tags, but they were mounted in the license-plate holder, not the rear window. In short, the car that was stopped actually fit the description broadcast over the police radio; unfortunately, it did not fit the description that the victim says he gave the police or the description of the vehicle that he confirmed at trial.

{¶ 32} Hence, our analysis consists of the following facts. The victim did not know the robber. The victim had very little time to view the robber. He saw the side of the robber's face out of the corner of his eye, in the middle of the night, and then he saw him from the rear as the robber was crossing the street to return to his car. He had a better view of the robber's car as it passed by him than he did of the robber himself. His description of the robber at trial was a tall black male, dressed in blue, wearing a blue do-rag, with perhaps some facial hair. The record is silent as to the height of appellant or whether at the time of the arrest or at trial, appellant had facial hair. There is likewise nothing in the record as to appellant's weight or build.

{¶ 33} The following facts are inconsistent with the description given the police. The victim insisted at trial that the car the robber was driving was blue. He also insisted that the car had temporary tags in the back window. The car appellant was driving was black.[3] The temporary tag was not in the back window but rather was mounted in the license-plate holder. The three $100 bills were not found on appellant or in his car; the blue do-rag was not found on appellant or in his car; no gun was found on appellant or in his car.

{¶ 34} Some may argue that since the jury in this case found appellant guilty at trial, there is no obligation to analyze whether the tainted procedure led to the possibility of misidentification. This is to confuse the role of the judge and jury in regard to the legal issues surrounding an identification.

{¶ 35} A hearing by the court on a suppression motion makes the court a gatekeeper. The court decides, *under direction of the law,* what will be admissible and what will not. Admissible evidence is presented to the jury for its consideration; inadmissible evidence is not. The analysis in this case is complicated by the fact that due process directs us to utilize facts in our analysis that were not before the judge at the time of the suppression motion, but rather were elicited at trial subsequent to that hearing. Further complicating this inquiry is the fact that the direct examination and cross-examination of the trial witnesses were not motivated by a need to explore the factors under *Biggers,* but other factors endemic to the case.

---

3. There is no probable-cause issue here; it was unrebutted that the radio call that went out was for a black Lexus.

{¶ 36} A jury is not instructed that a show-up is a widely condemned practice. A jury is not instructed to analyze the five factors articulated in *Biggers* in assessing the reliability of the identification. While a defense attorney may argue to a jury that an identification is unreliable (or a prosecutor may argue that it is reliable), juries do not engage in legal analysis; they deal in factual analysis. Accordingly, the fact that a jury found appellant guilty is not dispositive of the validity of the out-of-court identification.

{¶ 37} In this case, the victim's opportunity to view the robber was exceedingly short and late at night, and it occurred under frightening circumstances.[4] The only part of the description of the robber confirmed at trial was that he was a black man. The record is silent as to appellant's height, weight, build, or existence (or nonexistence) of facial hair. The police officer testified that at the time of arrest, appellant was wearing blue jogging pants; the victim stated that the robber wore blue jeans.

{¶ 38} The victim was certain the Lexus was blue; however, the car that the defendant was arrested in was black. The victim was certain that the temporary tag was located in the rear window; however, the car that appellant was arrested in had temporary tags mounted in the license-plate holder. The victim was even certain that Plaintiff's Exhibits 1 and 2 (photos of the car that appellant was driving at the time of the arrest) was the car that the robber was driving, even though the Lexus in the picture is clearly black and the tags are clearly in the license-plate holder. The significance of the victim being "100% certain" of his identification of appellant must be viewed in light of these other "certainties."

{¶ 39} In sum, the only prong of *Biggers* tending to show reliability in the show-up is the victim's "level of certainty" in making the identification. That evidence is diluted when viewed in conjunction with the victim's level of certainty of other facts known to be in error.

{¶ 40} Accordingly, the trial court should have suppressed the show-up identification as a violation of appellant's right to due process under Sections 10 and 16, Article I of the Ohio Constitution and the Fourteenth Amendment to the United States Constitution. Appellant's first assignment of error is sustained.

{¶ 41} The remaining issues raised by appellant (sufficiency and manifest weight of the evidence) are moot, and therefore we need not consider them. See App.R. 12(A)(1)(c).

---

4. In answer to the prosecutor's question, "Now, when the gun was to your head, what were you focusing on? What were your eyes focused on?" The victim answered, "My life."

{¶ 42} The judgment is reversed, and the cause is remanded to the trial court for further proceedings consistent with this opinion.

Judgment reversed
and cause remanded.

BLACKMON, J., concurs.

CALABRESE, P.J., dissents.

ANTHONY O. CALABRESE JR., Presiding Judge, dissenting.

{¶ 43} I respectfully dissent from the majority's opinion and would find instead that the court did not err in denying appellant's motion to suppress the eyewitness identification. The trial court ruled at the suppression hearing that the factual inconsistencies of the identification amounted to credibility questions for the jury. "I think this goes to the quality of the identification. That's going to be a jury question." I agree with the trial court's ruling and would affirm appellant's conviction.